No. 25521

**The People of the State of Colorado v. Larry Ray Algien**
(501 P.2d 468)

Decided October 2, 1972.

Robert R. Gallagher, Jr., District Attorney, Eighteenth Judicial District, James F. Macrum, Jr., Deputy, for plaintiff-appellant.

Rollie R. Rogers, State Public Defender, J. D. MacFarlane, Chief Deputy, James F. Dumas, Jr., Deputy, for defendant-appellee.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

This is an interlocutory appeal by the People, pursuant to C.A.R. 4.1, from an order of the Arapahoe County District Court suppressing an incriminating written statement made by defendant-appellee which implicated him in the crime of arson. We affirm the order of suppression.

The record establishes that at approximately 1 a.m. on September 1, 1971, at a complex known as Dayton Square in Aurora, Colorado, an apartment building under construction was completely destroyed by fire. Defendant was one of the security guards on duty at the time the fire broke out. The following day, investigating officers from the Aurora police department arson division suggested that defendant and other security guards be given lie detector tests. Defendant's employer, Walter Croy, who owned and operated the security

service employed by the Dayton Square project, requested that each of his guard-employees take the lie detector test in order to clear his company from involvement in the fire. Defendant initially agreed to submit to the examination, which was then scheduled for September 23, 1971. He changed his mind and declined to appear.

Detective Hurst of the Aurora police talked with defendant concerning his unwillingness to take the test and advised him: "Well, it won't hurt one way or the other, whether you take it or not, because the results can't be used without your permission." Defendant still declined to cooperate for "personal reasons." After several discussions with his employer, Mr. Croy, in which it was suggested that his job might be jeopardized if he did not take the polygraph examination, defendant finally agreed to do so.

On the morning of November 3, defendant was driven to the Adams County sheriff's office by Mr. Croy. There, they met Detective Hurst who introduced defendant to Officer Burt Johnson, chief investigator and polygraph examiner for the Adams County sheriff's department.

Johnson took defendant into a private office for the examination. He first read a form of consent to the defendant, which the defendant then read and signed. The consent form authorized Johnson to give the results of the examination and any opinions relating to it to the Adams County sheriff's department, the Aurora police, the Arapahoe County District attorney and the defendant's employer. The consent also released each of them from all liability arising out of the polygraph examination. Johnson next informed defendant about the polygraph machine. He testified:

"I explained to him how the polygraph worked and if he didn't have anything — You know, if he would be telling the truth to the investigator, that he didn't have anything to worry about, there would be no problem; and I also told him if he had not been telling the truth to the investigator, that once I completed the examination that he would have a problem convincing me that he wasn't involved, if his chart

so showed that he was. I attempted to get him at this point that if he was involved to tell me about it and not bother to take the examination. He assured me at that point he was not involved. So we went ahead with the examination."

Neither Officer Johnson, nor any other officer advised defendant of his Fifth Amendment rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, before administering the polygraph examination.

The test was administered and among the various questions asked were "five or six" relevant or hot questions concerning the alleged arson. Defendant denied any involvement in the fire, or other fires which had previously occurred at the Dayton Square complex. The examiner, Johnson, testified that the results of the test indicated the defendant was untruthful in his answers to the relevant questions. Johnson then re-tested the defendant twice, using the same questions originally asked, and the result indicated the same deception as shown in the first examination.

Officer Johnson then confronted defendant with the result of the test, telling him that the polygrams indicated he had not been honest, and that he (Johnson) believed defendant had set the fire in question. They discussed the matter at some length and, finally, defendant broke down, admitting he had in fact set the fire. At this point, Johnson called in Aurora Detective Hurst, inasmuch as the matter involved an Aurora case. He told Hurst that the defendant wanted to talk to him about the fire. Detective Hurst immediately advised defendant of his *Miranda* rights and then obtained the written statement from him in which he confessed to the crime.

The trial court found that the arson investigation, insofar as defendant was concerned, reached the accusatory stage when Officer Johnson concluded from the polygraph examination that defendant was not telling the truth, at which time the suspicion of guilt focused on him; that at that point in the investigation Officer Johnson should have advised defendant of his *Miranda* rights, and when he failed to do so and

proceeded to elicit the oral confession, defendant's Fifth Amendment rights were effectively violated; and that even though defendant was thereafter advised of his rights by Detective Hurst, such advisement was not effective to avoid the taint of the illegally obtained oral confession. The court concluded that the motion to suppress the written confession should be granted.

I.

The People contend that the court erred in ruling that the *Miranda* warnings should have been given in this case because there was no custodial interrogation in the *Miranda* sense. We agree that both custody and interrogation must be involved before the *Miranda* rules apply. *People v. Smith,* 173 Colo. 10, 475 P.2d 627. We disagree, however, that the defendant was not here subjected to custodial interrogation. *Miranda, supra,* states:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. * * *"

It is clear under the facts of this case that defendant was not taken into custody and brought into the sheriff's office. Initially, he voluntarily appeared for the polygraph examination at the instance of the investigating officer. That his appearance was initially voluntary, however, does not preclude the characterization of his presence thereafter as custodial, and the interrogation as custodial interrogation. *Fisher v. Scafati,* 314 F. Supp. 929, *aff'd,* 439 F.2d 307, *cert. denied,* 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719; *United States v. Harrison,* 265 F. Supp. 660; *People v. White,* 69 Cal. 2d 751, 72 Cal. Rptr. 873, 446 P.2d 993; *People v. Arnold,* 58 Cal. Rptr. 115, 426 P.2d 515; *People v. Bryant,* 87 Ill. App. 2d 238, 231 N.E.2d 4; *Dickerson v. State,* 257 Ind. 562, 276 N.E.2d 845; *State v. Skiffer,* 253 La. 405, 218 So.2d 313.

The question is, then, did defendant otherwise become deprived of his freedom in any significant way by the

circumstances attending his polygraph examination? The trial court had the difficult task of making this determination and concluded that at the time Officer Johnson became aware of the polygraph results, and stated his belief to the defendant that defendant had not told the truth, then the defendant was significantly deprived of his freedom. At that time, the *Miranda* warnings should have been given him.

We agree with the People's contention that in making this determination the objective test should be applied, that is, whether under the circumstances a reasonable man would believe himself to be deprived of his freedom in any significant way. *Lowe v. United States,* 407 F.2d 1391 (9th Cir. 1969); *People v. Arnold, supra; State v. Mumbaugh,* 107 Ariz. 589, 491 P.2d 443; *Commonwealth v. Marabel,* 445 Pa. 435, 283 A.2d 285.

In our view, the following circumstances attending the lie detector test, which concluded with the accusation that defendant was not telling the truth, would fairly give rise to a reasonable belief that defendant was no longer free to leave the sheriff's office at the end of the test. Initially, he was placed alone in a private room with Officer Johnson. Detective Hurst, the officer in charge of the arson investigation, remained outside the door with defendant's employer, Mr. Croy. The avowed purpose of the test was explained to defendant — that of determining his involvement in the fire and of eliciting a confession if possible. Questions directly bearing upon his suspected guilty conduct were asked of him. The test was given three times, and at the conclusion defendant was confronted with Officer Johnson's opinion that he was untruthful and that he had set the fire. Under such compelling circumstances, a reasonable person would with logic conclude that he could not leave the premises of his own free will but would be detained for formal arrest.

The People argue further that there was no custodial interrogation after defendant was confronted with Officer Johnson's accusation, in that Johnson was merely stating a belief concerning defendant's guilt and not interrogating him or attempting to get him to confess. This view is totally

unrealistic under the circumstances presented. The extensive interrogation which followed the polygraph examination, as a result of which defendant orally confessed, was custodial interrogation requiring prior *Miranda* warnings, the absence of which rendered the oral confession illegal and subject to suppression.

In addition, the People argue that assuming there was custodial interrogation, defendant clearly volunteered his confession. Again, realism compels the conclusion that the confession was the product of custodial interrogation.

II.

The remaining question is whether the written confession given Detective Hurst was so tainted by the illegal oral confession as to render it illegal and subject to suppression. If the written confession was a direct exploitation of the prior illegality — the fruit of the poisonous tree — it is likewise inadmissible. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

The record shows that after defendant had orally confessed Officer Johnson immediately advised Detective Hurst that defendant wanted to talk to him about the fires. Hurst then gave defendant his *Miranda* warnings and immediately proceeded to procure the written statement. Defendant had no opportunity to meditate or reflect upon his situation after the advisement had been given to him. It is fair to say that the questioning by Detective Hurst amounted to a continuation of the questioning by Officer Johnson, there having been no significant time interval between the two interrogations. The opportunity for the original taint to be dissipated by the lapse of time, as might exist in other situations, is not present here. *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423.

We make one final observation. Officer Johnson admitted during cross-examination that, while it was his custom to always give *Miranda* warnings to persons under criminal investigation before giving polygraph examinations, he unaccountably failed to do so in this case. As other courts have suggested, we believe prudent police practice requires

that when polygraph examinations are to be given persons in custody under investigation for suspected criminal conduct, they should be given *Miranda* warnings before the commencement of such examinations. *People v. Carter,* 7 Cal. App. 3d 332, 88 Cal. Rptr. 546; *Commonwealth v. Bennett,* 439 Pa. 34, 264 A.2d 706.

The ruling is affirmed. The cause is remanded for further proceedings not inconsistent with the views herein expressed.

MR. JUSTICE KELLEY not participating.