The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Evan Dean JOHNSON,
Defendant-Appellee.

No. 83SA379.

Supreme Court of Colorado,
En Banc.

Nov. 15, 1983.

Stanley C. Peek, Dist. Atty., Kenneth R. Storck, Deputy Dist. Atty., Greeley, for plaintiff-appellant.

Hyatt Legal Services, Roger P. Barrick, Northglenn, for defendant-appellee.

NEIGHBORS, Justice.

This is an interlocutory appeal under C.A.R. 4.1. The People challenge the trial court's order suppressing one of two confessions made by the defendant. We reverse and remand with directions to make findings of fact and conclusions of law on the issues of custody and voluntariness.

## I.

The defendant is charged in an information filed in the District Court for Weld County with one count of second-degree burglary[1] and one count of felony theft.[2] The People allege that the defendant entered the residence of Richard Sheetz located in Erie, Colorado and stole a Smith & Wesson .38 caliber handgun on March 9, 1983.

On March 10, 1983, Investigator Mary Bomgardner of the Weld County Sheriff's Office reviewed a case report concerning the alleged burglary of the Sheetz residence prepared the previous day by Officer Robert Stewart. The report included information obtained by Officer Stewart from Dana Sheetz, the victim's daughter. Ms. Sheetz told Officer Stewart that "only a couple people including Johnson [the defendant] knew that no one would be at the residence today," and that the defendant's place of employment was in close proximity to the Sheetz home. After reviewing the report, Investigator Bomgardner contacted Ms. Sheetz at the residence in Erie. Ms. Sheetz told Investigator Bomgardner that she had spoken with the defendant earlier, and told him that Officer Stewart wanted to talk with him about the burglary. Ms. Sheetz gave the defendant a piece of paper containing Officer Stewart's name and telephone number and told him to call the officer. According to Ms. Sheetz, "the defendant turned white," upon hearing this information. She also told the investigator that she had a "hunch" the defendant committed the burglary.

Investigator Bomgardner then contacted the defendant at his place of employment and requested that he step outside. Investigator Bomgardner was dressed in plain clothes and no weapon was visible. Once outside, the investigator showed the defendant her police identification and told him she wanted to discuss the burglary. She asked the defendant whether he saw anything unusual at the Sheetz residence the day of the burglary. The defendant answered that he did not. Investigator Bomgardner asked the defendant whether he would take a polygraph test. The defendant looked down at his feet for ten to

1. Section 18–4–203, C.R.S.1973 (1978 Repl.Vol. 8).

2. Section 18–4–401, C.R.S.1973 (1978 Repl.Vol. 8).

twenty seconds, appeared as if he was going to cry, and said "I guess I might as well tell you, I did it." Investigator Bomgardner immediately advised the defendant of his *Miranda* rights. The defendant initialed a form which stated that he understood his rights and waived them. The defendant then made a written statement.[3] After completing the statement, the defendant was taken to the Weld County Jail.

The defendant filed a motion to suppress his confession. At the suppression hearing, Investigator Bomgardner testified that when she initially contacted the defendant he was, in her mind, "somewhere between a witness and a suspect." She stated that she did not have probable cause to arrest him. She also testified that, in her mind, the defendant was no longer free to leave after he confessed to the burglary. However, the investigator stated that the defendant was free to leave before he made the inculpatory statement in response to her question concerning his willingness to take a polygraph test.

The defendant testified that from the time the investigator contacted him he felt that he was not free to leave. He interpreted the question of whether he would be willing to take a polygraph test as asking whether he committed the burglary. He believed that if he failed to answer he would, in effect, be admitting the crime. He also felt that if he simply left, that act would be considered an additional admission of guilt. The trial court granted the defendant's motion to suppress the oral statement, finding that there had been interrogation. The court stated:

> "I do feel in this case that that question was akin to putting the Defendant right smack on the spot. And in the eyes of the Defendant that was akin to asking him did he do it.
>
> "It seems to the Court, before someone is asked that ultimate question, if *Miranda* is to have any meaning, they have to

be advised that they are not required to answer that type of question."

## II.

The Fifth Amendment to the United States Constitution guarantees each citizen the privilege against self-incrimination. This amendment insures that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court interpreted this constitutional guarantee to require that, prior to custodial interrogation, law enforcement officials must advise an accused person of his right to remain silent, that any statement he does make may be used as evidence against him, and his right to the presence of an attorney, either retained or appointed.

### A.

The defendant urges us to uphold the trial court's suppression order and argues that he was psychologically deprived of his freedom of action to such an extent that prior to any questioning he should have been advised of his *Miranda* rights. The People contend that the trial court erred in ruling that *Miranda* warnings should have been given in this case because there was no custodial interrogation within the meaning of *Miranda.* The Court stated in *Miranda:*

> "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."

384 U.S. at 478, 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. *See also People v. Orf,* 172 Colo. 253, 472 P.2d 123 (1970). We agree that the procedural safeguards required by *Miranda* are triggered only when a suspect

---

**3.** The trial court scheduled a further hearing on the issue of whether the written statement was the fruit of the oral statement under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Accordingly, the issues in this appeal are limited to those presented by the trial court's order suppressing the defendant's oral statement, "I guess I might as well tell you, I did it."

is interrogated in a custodial setting. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972); *People v. Smith,* 173 Colo. 10, 475 P.2d 627 (1970). In *Beckwith,* the Court noted that unless the suspect is in a custodial surrounding, the interrogation cannot be considered inherently coercive.

■ The question here is whether the defendant was "in custody" at the time of the initial questioning. Custodial interrogation requiring the giving of *Miranda* warnings does not necessarily refer to police station interrogation. *See Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (the suspect was in custody when he was awakened at 4:00 a.m. in his bedroom by four police officers who began to question him about a murder); *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (a defendant in jail serving a sentence for a conviction of a state charge is in custody for *Miranda* purposes when he is interrogated by federal officers about a federal crime); *People v. Parada,* 188 Colo. 230, 533 P.2d 1121 (1975) (a defendant who voluntarily reported to district attorney's office in response to a letter was not in custody because she testified that she was neither required to meet with the investigators nor that she had to remain at the office once she arrived). Likewise, not all station house interrogations rise to the level of custodial interrogation. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (the defendant's compliance with officer's request that he come to police station to discuss something, and the ensuing station house interrogation during which he confessed to burglary was not a custodial interrogation which required the *Miranda* advisement prior to questioning).

■ Custodial interrogation requires that the interrogation be conducted under circumstances where the person has been taken into custody or deprived of his/her freedom of action in any significant way. *Parada,* 188 Colo. 230, 533 P.2d 1121. Absent an actual arrest or testimony by the police that the suspect was not free to leave at the time of the interrogation, such factors as the purpose, place, and length of the interrogation must be examined to decide whether the accused was in custody. In making this determination, an objective test must be applied. The standard is "whether under the circumstances a reasonable man would believe himself to be deprived of his freedom in any significant way." *Algien,* 180 Colo. at 7, 501 P.2d at 471; *People v. Marioneaux,* 44 Colo.App. 213, 618 P.2d 678 (1980). This objective standard is consistent with the decisions of this court and the United States Supreme Court which construe the word "seizure" for the purposes of the fourth amendment. *See United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *People v. Pancoast,* 659 P.2d 1348 (Colo. 1982)[4] (test is whether under the circumstances surrounding the incident a reasonable man would have believed that he was not free to leave); *People v. Bookman,* 646 P.2d 924 (Colo.1982).

■ The officer's subjective state of mind is not the appropriate standard for determining whether and when a person has been arrested or otherwise deprived of his freedom of movement in any significant way under either the fourth or the fifth amendments. *See Pancoast,* 659 P.2d 1348. However, the officer's state of mind is relevant to the issue of whether he, as a person of reasonable caution, has knowledge of facts and circumstances which establish the existence of probable cause to arrest the suspect under the fourth amendment. *See Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■ In defining "seizure" this court has stated:

4. *People v. Pancoast* was originally reported at 644 P.2d 314. However, the opinion was modified, but the modifications were not reported. *Pancoast,* as modified, was republished at 659 P.2d 1348, which is the official opinion of the court. *See People v. Lewis,* 659 P.2d 676, 681 n. 3 (Colo.1983).

"Admittedly, when a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person in a constitutional sensee.... It does not follow, however, that every personal confrontation between a police officer and a citizen, which results in some form of interrogation directed to the citizen, necessarily involves a 'seizure' of the person."

*People v. Pancoast,* 659 P.2d at 1350 (citations omitted). It is only when the officer, by means of physical force or show of authority, has in some way restrained the defendant's liberty that the court may conclude a seizure has occurred. *Id.*

Whether a reasonable person, under the circumstances, would have felt he/she was not free to leave is a factual determination to be made by the trial court. The trial court is required to make findings of fact whenever it rules on a motion to suppress, *People v. Duncan,* 176 Colo. 427, 498 P.2d 941 (1971), because legal conclusions without specific findings of fact render appellate review impossible. *People v. Hoinville,* 191 Colo. 357, 553 P.2d 777 (1976).

The trial court made no finding as to whether the defendant was in custody when Investigator Bomgardner asked him if he would be willing to take a polygraph test. Accordingly, the trial court must determine whether the defendant was in custody for purposes of requiring the *Miranda* warnings at the time the inculpatory statement was made.

Since the standards to be employed in determining the meaning of "custody" under the fifth amendment for purposes of *Miranda* and "seizure" for purposes of the fourth amendment are identical, the trial court on remand should apply the relevant criteria announced in *Pancoast,* 659 P.2d 1348, which include the time, place, and purpose of the encounter; the words used by the officer; the officer's tone of voice

and general demeanor; the manner in which the defendant was escorted out of his place of employment; the officer's response to any questions by the defendant; and the defendant's verbal or non-verbal response to any directions given to him by the officer. *See also People v. Parada,* 188 Colo. 230, 533 P.2d 1121 (1975) (manner of approach and tone and extent of questioning by police), and *People v. Rodriquez,* 645 P.2d 857 (Colo.App.1982) (in determining whether defendant has been taken into custody for purposes of *Miranda,* courts should consider time of interrogation, persons present, indicia of formal arrest, length and mood of interrogation, lack of arrest after interrogation, and administration of *Miranda* warnings).

### B.

The trial court held that before a defendant is asked the "ultimate question" he must be given the *Miranda* warnings. The court found that the investigator's question as to whether the defendant would be willing to take a polygraph test was the equivalent, under the circumstances, of asking the defendant if he had committed the crime. Thus, the court suppressed the defendant's statement. We interpret the trial court's ruling to be a determination that the question asked by Investigator Bomgardner was express questioning or its functional equivalent which was reasonably likely to elicit an incriminating statement from the defendant. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). This ruling that there was interrogation is supported by the record and will not be reversed on appeal.[5] *Goodwin v. District Court,* 196 Colo. 246, 586 P.2d 2 (1978); *People v. Parks,* 195 Colo. 344, 579 P.2d 76 (1978); *People v. Ellis, III,* 189 Colo. 242, 539 P.2d 132 (1975).

### III.

In his brief, the defendant asks that this court decide whether the defendant's con-

---

**5.** The court based its ruling on the nature of the question and the manner in which it was asked of the defendant considering his "full reaction to the situation," including his demeanor during the interrogation which was described as

"nervous," "embarrassed," and "tearful and close to crying," his demeanor in court and his lack of sophistication "in criminal law or criminal procedures."

fession was voluntary in light of all the circumstances. We decline his request.

The record before us indicates that the defendant filed a motion under Crim.P. 41(g) to suppress "any and all involuntary confession(s) and/or admission(s)." As we understand the defendant's position, he claims that his confession should be suppressed on two grounds. First, he argues that the requirements of *Miranda* were violated because the incriminating statement was obtained during custodial interrogation. We addressed that issue in section II of this opinion. Second, he contends that his confession was involuntary. The ruling of the trial court contains no specific findings of fact and conclusions of law on the question of voluntariness. No useful purpose would be served by enumerating the principles of law governing voluntariness in the absence of a ruling by the trial court. We note, however, that the Court in *Beckwith*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1, recognized that courts must determine whether a confession given in a noncustodial setting is voluntary under the totality of circumstances standard. The Court stated:

> "We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .' *Rogers v. Richmond,* 365 U.S. 534, 544 [81 S.Ct. 735, 741, 5 L.Ed.2d 760] (1961). When such a claim is raised, it is the duty of an appellate court, including this Court, 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.' *Davis v. North Carolina,* 384 U.S. 737, 741–742 [86 S.Ct. 1761, 1764, 16 L.Ed.2d 895] (1966). Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive."

425 U.S. at 347, 348, 96 S.Ct. at 1617, 48 L.Ed.2d at 8.

The order of the trial court is reversed. This case is remanded for further proceedings in accordance with this opinion.

ROVIRA, J., dissents.

ROVIRA, Justice, concurring in the judgment of reversal and otherwise dissenting:

I concur in the result reached by the majority. I am not convinced, however, that this case should be remanded for a determination of whether the defendant was "in custody." In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the United States Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Eleven years later, in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the Supreme Court explained that the phrase "in custody" means more than routine police questioning during an investigation. In *Oregon,* a police officer investigating a burglary left a note at the defendant's apartment asking him to call because "I'd like to discuss something with you." When the defendant called, the officer asked if they could meet at a nearby state patrol office. The defendant was told that he was not under arrest but that the police believed he was involved in the burglary. Within a few minutes, the defendant confessed to the crime. The Supreme Court concluded that a *Miranda* advisement was not required because the defendant was not "in custody":

> "In the present case . . ., there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½ hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*Id.* at 495, 97 S.Ct. at 714. *See People v. Pancoast,* 659 P.2d 1348, 1350 (Colo.1982) ("It does not follow ... that every personal confrontation between a police officer and a citizen, which results in some form of interrogation directed to the citizen, necessarily involves a 'seizure' of the person."); *People v. Parada,* 188 Colo. 230, 233–34, 533 P.2d 1121, 1123 (1975) ("In the absence of actual arrest, something must be said or done by the authorities either in their manner or approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.").

Based on the Supreme Court's interpretation in *Oregon,* I am satisfied that the defendant in this case was not "in custody" when the investigator asked him about the Sheetz burglary and whether he would submit to a polygraph test. Even if the question about the polygraph test occurred in a "coercive atmosphere," his freedom of action was not significantly deprived, and he was apparently free to go at any time.

Under the circumstances, I do not believe that a remand on the "in custody" question is warranted.

In addition, I dissent from Part II(B) of the majority opinion, which affirms the trial court's ruling that the investigator's inquiry about the polygraph test was a subtle way of asking the "ultimate question": did the defendant commit the burglary? The majority characterizes this inquiry as "express questioning or its functional equivalent which was reasonably likely to elicit an incriminating statement from the defendant" and cites *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in support of its conclusion: Maj. op. at 962.

In my view, the question about the defendant's willingness to take a polygraph test was not accusatorial but investigative in nature and, as a result, did not require a prior *Miranda* advisement. The majority misreads *Rhode Island* and in the process supports an interpretation by the trial court of the question asked by the investigator which is not supported by the record. In *Rhode Island,* 446 U.S. at 300–02, 100 S.Ct. at 1689–90, the United States Supreme Court explained that

"the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.... [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.... [However,] since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."

(emphasis in original).

There is nothing in the record to support a conclusion that the investigator should

have known that her question relating to the polygraph test was reasonably likely to elicit the defendant's confession.

The majority opinion in effect shifts the focus on what the investigator should have known at the time she first encountered the defendant, to the time when the defendant, after the opportunity to discuss the matter with counsel, testifies in court. I conclude that the investigator in this case neither knew nor should have known that her question about the polygraph test was reasonably likely to elicit the defendant's confession. It was an investigative inquiry directed to a person who was "somewhere between a witness and a suspect." I am not persuaded that his demeanor should be the determining factor in the court's analysis of whether "interrogation" has occurred.

In my opinion, the question about the polygraph test was not express questioning or its functional equivalent and the trial court's ruling should be reversed.