23CA0801 Peo v Casados 08-21-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0801
Jefferson County District Court No. 21CR2375
Honorable Diego G. Hunt, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jesse Casados,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Harris and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 21, 2025

---

Philip J. Weiser, Attorney General, Jenna Baker, Assistant Attorney General
Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Julieanne Farchione, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jesse Casados, appeals his convictions for first degree aggravated motor vehicle theft, reckless driving, and careless driving resulting in injury.  He contends that the trial court erroneously admitted his statements to police and that the prosecution engaged in misconduct.  We affirm his convictions.

I.     Background

¶ 2     In September 2020, police were dispatched to a multi-car accident in Jefferson County.  Officer Shaun Granmoe, who arrived at the scene around 10:30 or 10:45 a.m., saw Casados being removed from the driver's seat of one of the cars.  Casados was the only person injured.  Granmoe described Casados's injuries as "pretty significant," including a "broken or shattered femur, . . . a broken or shattered wrist," and a potential brain bleed.  He noted that Casados was clearly "in a lot of pain" and was screaming at the scene.

¶ 3     Casados was taken to the hospital, and Granmoe followed to get his statement.  Before speaking to Casados, Granmoe learned he may have used drugs that day, and he was driving a stolen car.  Granmoe spoke to Casados in his hospital room.  Casados was laying in a hospital bed and being treated by medical staff, who

1

were "going in and out" of the room. Granmoe sat on the right side of Casados's bed; medical equipment and nurses starting intravenous lines (IVs) were to his left.

¶ 4　　Granmoe, who was armed and uniformed, identified himself as a police officer and asked Casados basic questions to gauge his alertness. Granmoe testified that Casados was awake, appeared lucid, knew he was involved in a crash, and knew he was at a hospital (but may not have known which hospital). Granmoe next asked Casados how the crash happened. Casados explained "that he was up north in Denver, didn't know exactly where," but when he left the residence, a male named Lil Nut or Lil Nutty confronted him, entered the car, held him at gunpoint, and told him to drive. Casados said this person exited the car about thirty minutes before the crash.

¶ 5　　Granmoe then read Casados his *Miranda*[1] rights and asked if he understood them and wished to continue speaking. Casados said he understood his rights. Granmoe described Casados as "very open to speaking" but noted that his statements were at times

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444-45, 478-78 (1966).

unclear or confusing as to the timeline, when and where the alleged male entered the car, why that male exited the car, and whether law enforcement was pursuing the car before the crash.[2]

¶ 6     When asked about the car, Casados said he believed it was likely stolen because "it was associated with Lil Nutty."  He did not explain the basis for this belief or his relationship with Lil Nutty. As for the suspected drug use, fire department officials told Granmoe that Casados "admitted to taking fentanyl" before the crash.  But Casados told Granmoe he "uses Percocet and had used Percocet the day prior" but did not take drugs or medication before the crash and was not otherwise intoxicated.  However, Granmoe testified that hospital staff "most likely" gave Casados "medications to help with his pain."

¶ 7     Because Casados needed further treatment, Granmoe ended the interview.  He described the tone of the conversation and Casados's mood as conversational and friendly.  Granmoe made no

---

[2] Fire department officials told Granmoe that Casados believed law enforcement was pursuing him in the car.  Granmoe's investigation revealed no evidence of any such pursuit.  When asked about this, Casados first said he was being pursued as far as he knew and then said, "as far as I know, I don't know," which confused Granmoe.

threats or promises, nor did he put his hand on or remove his weapon. He also did not touch or physically restrain Casados, but he agreed that Casados was unable to leave due to his injuries. Casados did not ask Granmoe to leave or say that he did not wish to speak with Granmoe.

¶ 8     Casados was charged with first degree aggravated motor vehicle theft, reckless driving, and careless driving resulting in injury. Before trial he moved to suppress his statements to Granmoe, which the trial court denied after a hearing. The court found that Casados was not in custody when Granmoe initially spoke to him, he validly waived his *Miranda* rights, and his statements were voluntary. Casados was convicted as charged.

¶ 9     On appeal, Casados argues that his statements should have been suppressed because (1) he was subject to custodial interrogation in the hospital, and Granmoe did not give him a *Miranda* warning at the start of the interrogation; (2) he did not validly waive his *Miranda* rights; and (3) his statements to Granmoe were involuntary. He also contends that the prosecutor made several improper statements during closing argument. Finally, he contends that cumulative error warrants reversal.

## II. Casados's Statements to Police

### A. Standard of Review

¶ 10    When reviewing a suppression ruling, we only consider evidence presented at the suppression hearing. *Moody v. People*, 159 P.3d 611, 614 (Colo. 2007). When reviewing a trial court's determinations as to whether a defendant was in custody, validly waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and made voluntary statements to law enforcement, we defer to the court's factual and credibility findings that enjoy record support. *People v. Davis*, 2019 CO 84, ¶ 18 (custody); *People v. Thames*, 2015 CO 18, ¶ 13 (waiver); *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010) (voluntariness). We review de novo the court's ultimate determinations of whether a defendant was in custody, a waiver was valid, and a statement was voluntary. *Davis*, ¶ 18; *Thames*, ¶ 13; *Effland*, 240 P.3d at 878. The prosecution must prove the validity of a *Miranda* waiver and the voluntariness of a defendant's statements by a preponderance of the evidence. *Thames*, ¶ 13; *Effland*, 240 P.3d at 878.

## B. Custody

¶ 11    Casados first argues that the trial court erroneously concluded that he was not initially in custody when Granmoe questioned him, so *Miranda* did not apply.[3]  We conclude that the court did not err.

¶ 12    Under the Fifth Amendment to the United States Constitution, a "criminal defendant may [not] be compelled to testify against himself."  *People v. Padilla*, 2021 CO 18, ¶ 15.  To protect this right, police must give *Miranda* warnings before engaging in custodial interrogation.  *Id.* (citing *Miranda*, 384 U.S. at 444-45, 478-79).  If police do not give *Miranda* warnings during a custodial interrogation, a defendant's statements made during the interrogation are inadmissible.  *Id.*

¶ 13    However, "*Miranda* warnings are required only when a person is both in custody and subject to police interrogation."  *Id.*  "A person is in custody . . . if [he] has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that [his] freedom of action had

---

[3] The prosecution did not present evidence or argument about whether the conversation was an interrogation, and the trial court made no findings on this issue.  Because we conclude that Casados was not in custody, we need not reach the interrogation question.

been curtailed to a degree associated with formal arrest." *Id.* at

¶ 16 (alterations in original) (citation omitted). To determine

whether an individual was in custody, we consider "the objective

circumstances of the interrogation, not . . . the subjective views . . .

[of] the interrogating officer[] or the person being questioned." *Id.*

(citation omitted). We consider several factors, but "[n]o single

factor is determinative":

> (1) the time, place, and purpose of the
> encounter; (2) the persons present during the
> interrogation; (3) the words spoken by the
> officer to the defendant; (4) the officer's tone of
> voice and general demeanor; (5) the length and
> mood of the interrogation; (6) whether any
> limitation of movement or other form of
> restraint was placed on the defendant during
> the interrogation; (7) the officer's response to
> any questions asked by the defendant;
> (8) whether directions were given to the
> defendant during the interrogation; and (9) the
> defendant's verbal or nonverbal response to
> such directions.

*Id.* (citation omitted).

¶ 14    Generally, courts "have held that in-hospital questioning does

not amount to custodial interrogation." *People v. Milhollin*, 751 P.2d

43, 52 (Colo. 1988) (citation omitted); *see, e.g.*, *People v. Theander*,

2013 CO 15, ¶¶ 25-37; *People v. DeBoer*, 829 P.2d 447, 449 (Colo.

7

App. 1991) (hospitalized defendant was not in custody because she "was alert and attentive," cooperated with police, and — although confined to a hospital bed — was not otherwise physically restrained); *People v. Miller*, 829 P.2d 443, 445 (Colo. App. 1991).

¶ 15    In *People v. Sampson*, 2017 CO 100, ¶¶ 24-31, our supreme court held that a hospitalized defendant was not in custody for *Miranda* purposes.  It found the following factors weighed in favor of concluding Sampson was in custody: "(1) the conversation occurred in a small room; (2) [the officer] was situated between Sampson and the door; (3) Sampson was connected to medical equipment during the conversation;" (4) the officer suggested that he did not believe Sampson's version of events; (5) the officer was "in uniform and carrying a weapon; and (6) [the officer] didn't tell Sampson he was not in custody."  *Id.* at ¶ 25.

¶ 16    Conversely, the court determined the following factors weighed against concluding that Sampson was in custody: (1) the officer "asked open-ended questions in a conversational tone and Sampson provided narrative responses; (2) Sampson was not visibly upset . . .; (3) [the officer] presented few details of what may have occurred," and his questions were not "merely targeted at eliciting

Sampson's agreement; (4) [the officer] did not handcuff or physically restrain Sampson;" (5) the officer said Sampson would not be arrested until he was released from the hospital; and (6) medical staff were present during the conversation. *Id.* at ¶ 26. While the factors were equally split, the court determined that "the overall atmosphere was non-coercive" and reversed the trial court's order suppressing Sampson's statements. *Id.* at ¶¶ 27, 32.

¶ 17 In *Effland,* our supreme court reached the opposite conclusion, holding that a hospitalized defendant was in custody but describing the case as a "close one." 240 P.3d at 875-76. As relevant here, the factors weighing in favor of a custody finding included that (1) Effland repeatedly said he wanted an attorney and did not want to talk, but the officers ignored his requests; (2) a uniformed officer was stationed outside the door; (3) Effland "was emotionally distraught and was crying"; (4) there were two officers, who had excluded Effland's daughter from the room; (5) the officers' purpose was to elicit information about Effland's role in a homicide; (6) the interrogation was not narrative and consisted of questioning and short answers; and (7) Effland could not "leave the premises and was connected to an [IV]." *Id.*

¶ 18    Here, the factors that favor a custody finding include (1) Casados was connected to medical equipment and unable to leave, (2) Granmoe was uniformed and carrying his weapon, and (3) Granmoe never told Casados he was not in custody. *See Sampson*, ¶ 25. It is unclear whether the conversation occurred in a small room, *see id.,* but Granmoe's testimony suggested that the hospital room was larger than others. It is also unclear if Granmoe sat between Casados and the door. *See id.*

¶ 19    As to the factors weighing against custody, (1) Granmoe asked open-ended questions, and Casados provided narrative responses; (2) the conversation's mood and tone were friendly and conversational; (3) Casados was not visibly upset; (4) Granmoe "presented few details of what may have occurred and did not ask questions merely targeted at eliciting [Casados's] agreement;" (5) Granmoe did not touch, handcuff, or restrain Casados; and (6) medical staff were present. *Id.* at ¶ 26. Finally, nothing indicates that Granmoe challenged Casados's narrative. *See id.* at ¶ 25. We do not consider the length of the conversation because the record only reflects that Granmoe arrived at the scene around 10:30

or 10:45 a.m., and he Mirandized Casados at 12:01 p.m., but it is unclear when the conversation started or ended. *See Padilla*, ¶ 16.

¶ 20 Unlike *Effland*, there was only one officer, no officers sat outside the door, Casados did not ask for an attorney or say he wanted to stop talking, he was not visibly upset or crying, and no one was excluded from the room. *See* 240 P.3d at 875; *see also Theander*, ¶¶ 36-37 (finding a hospitalized defendant not in custody and emphasizing that police stopped questioning her after she asked for an attorney). Moreover, Granmoe's initial purpose was to gain a general sense of the accident, not necessarily to elicit information about Casados's role in the car's theft. *See Effland*, 240 P.3d at 875.

¶ 21 Casados argues that Granmoe was not investigating the general circumstances of the crash because he was investigating a possible DUI, knew the car was stolen, knew Casados caused the crash, and no one else was injured. *See id. But see Theander*, ¶¶ 6, 37 (Theander was not in custody even though officers knew she "could be a suspect or witness in [a] homicide investigation" before questioning her). Even if Granmoe's purpose weighs in favor of finding Casados was in custody, it does not tip the scales overall.

11

¶ 22    Casados also argues that the trial court did not consider the totality of the circumstances when it determined that he was not in custody. The court's custody finding was based on its conclusion that, while Casados's injuries prevented him from leaving, "he was not restrained in any way, and . . . Granmoe was investigating the circumstances surrounding the offense . . ., so he was under no obligation to advise [Casados] initially." Although the court did not consider every factor, we conclude that its custody finding was correct under the totality of the circumstances. *See Padilla*, ¶ 16. And we may affirm on any basis supported by the record. *People v. Lopez*, 2024 COA 26, ¶ 11 (*cert. granted* Dec. 23, 2024).

¶ 23    Finally, Casados suggests that the timing of the *Miranda* warnings — only after he had made incriminating statements — supports custody. We are not persuaded. *See Sampson*, ¶¶ 5-7 (a victim said Sampson attacked her, officers questioned Sampson at the hospital, and they Mirandized him after he admitted he had lied). Under the totality of the circumstances, we conclude that the trial court properly found Casados was not in custody when Granmoe initially questioned him. *See Padilla*, ¶ 16.

## C. The *Miranda* Waiver

¶ 24 Casados next argues that the trial court erroneously found that he validly waived his *Miranda* rights such that his post-warning statements were admissible. Because we determine that Casados was not in custody, we do not reach this issue. *See id.* at ¶ 15 (custody is required for *Miranda* to apply).

¶ 25 In *Sampson*, ¶¶ 5-8, as discussed, the officer Mirandized Sampson after he admitted to lying. Sampson then waived his rights, and the officer told Sampson he would be arrested once discharged from the hospital. *Id.* at ¶ 8. The trial court held that Sampson did not validly waive his *Miranda* rights and suppressed his post-warning statements. *Id.* at ¶ 1. In an interlocutory appeal, the State challenged the suppression order, and our supreme court reversed. "Assuming without deciding that giving *Miranda* warnings can be considered in determining whether a suspect is in custody," the court held "that Sampson was not in custody during any part of [the] conversation." *Id.* at ¶ 32. Because *Miranda* did not apply, the court did not consider the validity of his waiver. *Id.* at ¶¶ 2, 32.

¶ 26 We reach the same conclusion. Even fewer factors weigh in favor of finding custody here than in *Sampson.* And unlike

13

*Sampson*, Granmoe never told Casados he would be arrested upon discharge; he said an officer or detective would reach out for "any other follow up." That Granmoe read Casados his *Miranda* rights and determined Casados was no longer free to leave is also not dispositive. *See People v. Minjarez*, 81 P.3d 348, 353-54 (Colo. 2003) (an "undisclosed plan to take a suspect into custody" does not, alone, "establish . . . custody for *Miranda* purposes"). Because Casados "was not in custody during any part of [the] conversation," *Miranda* did not apply, and we need not consider whether he validly waived his rights.[4] *Sampson*, ¶ 32.

### D. Voluntariness

¶ 27  Next, Casados contends that his statements to Granmoe were involuntary. We disagree.

¶ 28  The United States Constitution "prevents admission of involuntary statements into evidence, regardless of the defendant's

---

[4] Neither party argued this to the trial court or on appeal, but we may affirm "on any ground supported by the record," even those the trial court "did not articulate or consider." *People v. Lopez*, 2024 COA 26, ¶ 11 (*cert. granted* Dec. 23, 2024); *Jordan v. U.S. Dep't of Just.*, 668 F.3d 1188, 1200 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record, [including] . . . arguments not reached by the district court or even presented to us on appeal.") (citation omitted).

custodial situation." *People v. Coke*, 2020 CO 28, ¶ 17. Voluntary statements are "the product of an essentially free an unconstrained choice," while statements are involuntary when "made after an 'individual's will has been overborne.'" *People v. Cerda*, 2024 CO 49, ¶ 37 (citations omitted). "[A] statement is involuntary if (1) the government's conduct was coercive and (2) that coercion 'played a significant role in inducing' a confession or an inculpatory statement." *Id.* (citation omitted). To assess whether a defendant's statements were voluntary, we consider the totality of the circumstances, including a non-exhaustive list of several factors:

> (1) whether the defendant was in custody;
>
> (2) whether the defendant was free to leave;
>
> (3) whether the defendant was aware of the situation;
>
> (4) whether the police read *Miranda* rights to the defendant;
>
> (5) whether the defendant understood and waived *Miranda* rights;
>
> (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
>
> (7) whether the statement was made during the interrogation or volunteered later;

(8) whether the police threatened [the] defendant or promised anything directly or impliedly;

(9) the method or style of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11) the length of the interrogation;

(12) the location of the interrogation; and

(13) the physical conditions of the location where the interrogation occurred.

*Id.* at ¶ 38 (alteration in original) (citation omitted).

¶ 29 On appeal, Casados primarily focuses on the tenth factor, his mental and physical condition. Before addressing this, we consider the other factors and conclude that the following factors weigh in favor of involuntariness: (1) Casados could not leave because of his physical condition, (2) the record suggests that he did not have an opportunity to speak to an attorney or anyone else before speaking with Granmoe, and (3) his statements were made during the conversation, not volunteered later. *See id.* We do not consider waiver because we did not reach that issue, nor do we consider the length of the encounter, which the record is unclear about.

16

¶ 30　　Conversely, the following factors weigh against involuntariness: (1) Casados was not in custody; (2) the trial court found he "was aware of his circumstances and his predicament," as evidenced by his response to questions about drug use and his "explanations for the circumstances of the crash"; (3) Granmoe Mirandized Casados; (4) Granmoe made no threats or promises; (5) the conversation was friendly and non-confrontational; and (6) the conversation occurred in a hospital room with medical personnel intermittently present. *Id.*; *cf. People v. Nkongolo*, 2025 CO 20, ¶ 24 (describing the coercive nature of "police-dominated atmosphere[s]" (quoting *Illinois v. Perkins*, 496 U.S. 292, 296 (1990))).

¶ 31　　With these factors in mind, we turn to Casados's argument that his potential drug use and physical condition rendered his statements involuntary. We first consider his alleged intoxication, noting that intoxication does not, alone, make a statement involuntary. *People v. Bryant*, 2018 COA 53, ¶ 23 (citation omitted). "Rather, coercive government conduct is the 'necessary predicate to the finding that a confession is not "voluntary."'" *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

17

¶ 32    In *Cerda*, ¶ 40, the defendant was slurring and mumbling, "ingested an opiate seven to eight hours before the interrogation[,] and said he was intoxicated and couldn't remember what had happened the day before; . . . was on antipsychotic medication that affected his cognitive abilities; [and] had been awake for approximately sixteen hours when the interrogation began." Police also continued to question Cerda after he invoked his *Miranda* rights, which the court described as coercive. *Id.* at ¶¶ 42, 44. Yet the court held that Cerda's statements were not involuntary because "he demonstrated an awareness of his situation and the consequences of speaking," and the coercive tactics did not overbear his will. *Id.* at ¶¶ 45, 47.

¶ 33    However, our supreme court held that a defendant's statements were involuntary when she had received morphine in the hospital even though she "understood and followed directions, . . . appeared to understand [the officer's] questions[,] and her responses were appropriate." *People v. Fordyce*, 612 P.2d 1131, 1132-33, 1134 (Colo. 1980). Expert testimony established the effects of morphine, including the likelihood that Fordyce would have had difficulty realizing she was speaking to police and

18

"perceiving the important effect of information given to the police." *Id.* at 1133; *cf. People v. DeBaca*, 736 P.2d 25, 28 (Colo. 1987) (distinguishing *Fordyce* because there was no evidence of medication being administered or the medication's possible effects).

¶ 34     Here, the record shows that, regardless of potential drug use, Casados was alert, coherent, aware of his circumstances, conscious, and appropriately responding to questions. *See Cerda*, ¶¶ 42-47; *cf. People v. May*, 859 P.2d 879, 883 (Colo. 1993) (finding a *Miranda* waiver invalid when the defendant was intermittently conscious, did not know the date or that he was in the hospital, and could not remember critical details of the accident). That Casados made some confusing statements and did not remember some details about the timeline or where he was before the accident is not dispositive — particularly where there was no evidence that he unsuccessfully invoked his *Miranda* rights. *See Cerda*, ¶¶ 45-47.

¶ 35     Finally, despite some evidence that Casados took fentanyl, he told Granmoe he had not used drugs and was not intoxicated. And while Granmoe believed Casados may have received pain medication, there was no testimony about the effects or onset of fentanyl or pain medication. *Compare Fordyce*, 612 P.2d at 1133,

19

*with DeBaca*, 736 P.2d at 28. And the prosecution was not, as Casados suggests, required to present such evidence. *See DeBaca*, 736 P.2d at 27-28 (holding that the trial court erred by finding that the State did not establish voluntariness even though it offered no evidence about purported medication or its effects). We therefore conclude that Casados's possible intoxication does not weigh in favor of finding his statements involuntary.

¶ 36 Similarly, we conclude that any pain resulting from Casados's injuries did not render his statements involuntary. The United States Supreme Court held that a defendant's confession was involuntary when "[h]e had been seriously wounded just a few hours earlier, . . . complained . . . that the pain in his leg was 'unbearable,' . . . was evidently confused and unable to think clearly," and unsuccessfully asked the officers to stop questioning him without an attorney. *Mincey v. Arizona*, 437 U.S. 385, 398-99, 401 (1978) (finding his statements "the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness").

¶ 37 *Effland* employed similar reasoning, noting that officers continued questioning Effland despite his "weakened physical and

mental state" and attempts to invoke his rights. 240 P.3d at 878. By contrast, nothing suggests that Casados's pain was so significant that he could not think clearly or was barely conscious (even if some of his statements were inconsistent or confusing). Importantly, unlike *Effland* and *Mincey*, Granmoe did not exploit Casados's weakened condition by continuing to question him after he invoked his rights. *See Theander*, ¶ 45 (Even if there is psychological coercion, it must "play[] a 'significant role' in inducing the statements in order to exclude them.") (citation omitted).

¶ 38 While it may have been more prudent for Granmoe to wait to question Casados until he was no longer in pain and receiving medical treatment, we conclude that — under the totality of the circumstances — the trial court did not err by finding Casados's statements to Granmoe voluntary. *See Cerda*, ¶ 38.

### III. The Prosecutor's Statements

¶ 39 Finally, Casados argues that several of the prosecutor's statements in closing arguments constituted misconduct that warrants reversal. While the statements were improper, the court's error in allowing them is not reversible.

## A.    Additional Facts

¶ 40    At trial, Granmoe testified about his conversation with Casados.  He first said Casados "stated that since [the car] was associated with Little Nut or Little Nutty, he believed it to be stolen." On cross-examination, the defense asked if Casados said the car was "most likely stolen."  Granmoe said, "Yes."  Finally, on redirect, the prosecutor asked if Casados said "he believed the car was stolen, or it was most likely stolen."  Granmoe said, "[B]ecause [it] was associated with Little [Nutty], it was believed to be stolen."

¶ 41    In closing arguments, the prosecutor said, "This isn't a mystery, folks.  [Casados] confessed.  Said, 'Yeah, I knew the car was stolen.'"  Defense counsel objected to facts not in evidence, the trial court overruled the objection, and the prosecutor continued, "And because he confessed, . . . there is no mystery here."  Next, the prosecutor said there was direct evidence of Casados's guilt: "You heard the officer who . . . asked [Casados] . . ., '[D]id you know it was stolen?  And [Casados's] response, 'Well it must have been because Little Nut was associated with it.'  Now that was a ridiculous story. . . . But at the very end he states, 'Yeah, I knew it was stolen.'"  The court overruled the defense's objection to facts

not in evidence. Finally, in rebuttal, the prosecutor said, "He runs a red. Gets in the horrible accident. Breaks his leg. And says, 'Yeah, I believed it was stolen.' You know what's another word for 'believe,' is 'know.'" Defense counsel did not object.

### B. The Prosecutor's Conduct Was Improper

¶ 42 To determine whether a prosecutor engaged in misconduct, we conduct a two-step inquiry. "First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances." *People v. Licona-Ortega*, 2022 COA 27, ¶ 85 (citing *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010)). We then "decide whether the misconduct warrants reversal under the applicable standard." *Id.* "Prosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn from it." *People v. Sparks*, 2018 COA 1, ¶ 21. But prosecutors may not misstate the evidence, "[n]or may they refer to facts not in evidence." *Id.* Similarly, prosecutors "may not misstate or misinterpret the law." *People v. McMinn*, 2013 COA 94, ¶ 62.

¶ 43 Casados argues that the prosecutor misstated the evidence and argued facts not in evidence by characterizing his statements as a confession and stating that he told Granmoe he knew the car

23

was stolen.  He also asserts that the prosecutor misstated the law by equating belief with knowledge.

¶ 44    As detailed above, Granmoe never testified that Casados said he knew the car was stolen; he testified that Casados said he believed the car was stolen.  Thus, the prosecutor both misstated the evidence (by misrepresenting Granmoe's testimony) and argued facts not in evidence (by replacing the word believe with the word know).  *See Sparks*, ¶ 21.  Similarly, equating belief with knowledge misstated the law.  *See* § 18-1-501(6), C.R.S. 2024 (defining the mental state, "knowingly," in the criminal context); *see also Leonardo v. People*, 728 P.2d 1252, 1256 (Colo. 1986) ("[K]nowledge is an assurance of a fact or proposition founded on perception by the senses, or intuition, while belief is an assurance based on evidence, and from other persons.  'Knowing' literally imports a state of mind close to absolute certainty; 'believing' requires something less.") (citation omitted).

¶ 45    The prosecutor's statement that Casados confessed also misstated the evidence.  Granmoe did not say Casados confessed to stealing the car or to knowing it was stolen.  *See Bruner v. People*, 156 P.2d 111, 117 (Colo. 1945), *abrogated by, Deeds v. People*, 747

P.2d 1266 (Colo. 1987) ("A confession is *an acknowledgment in express words* . . . of the truth of the guilty fact charged or of *some essential part of it*.") (citation omitted); Black's Law Dictionary 374 (12th ed. 2024) (defining "confession" as an "oral or written acknowledgement of guilt, often including details about the crime").

¶ 46    Therefore, we conclude that the prosecutor's statements were improper. *See Licona-Ortega*, ¶ 85.  However, as discussed below, we conclude that the misconduct does not warrant reversal because the evidence overwhelmingly supported Casados's convictions.

C.    The Prosecutor's Misconduct Does Not Require Reversal

¶ 47    We review unpreserved claims of prosecutorial misconduct for plain error. *Id.* at ¶ 88.  "To constitute plain error, any prosecutorial misconduct must be obvious and 'must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (citation omitted). "Prosecutorial misconduct in closing argument rarely constitutes plain error." *People v. Smalley*, 2015 COA 140, ¶ 37.  If a preserved claim of prosecutorial misconduct "'specifically and directly offend[s]' a constitutional right," we review for constitutional

25

harmless error. *Licona-Ortega*, ¶ 86 (alteration in original) (quoting *Wend*, 235 P.3d at 1097). We review preserved prosecutorial misconduct claims that do not "specifically and directly offend a [defendant's] constitutional right[s]" for harmless error. *Id.* at ¶ 87.

¶ 48    We first conclude that the court did not plainly err by allowing the prosecutor to equate belief with knowledge. *See id.* at ¶ 88. While the error may have been obvious, it did not "so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of" Casados's conviction. *Id.* (citation omitted).

¶ 49    For first degree aggravated motor vehicle theft, the prosecution had to prove Casados "knowingly obtain[ed] or exercise[d] control over the motor vehicle of another without authorization." § 18-4-409(2), C.R.S. 2020.[5] "Knowingly" applies both to exercising control over the vehicle and to an "awareness of lack of authority." *People v. Stellabotte*, 2016 COA 106, ¶ 20, *aff'd*, 2018 CO 66. The evidence established that Casados was driving a stolen car, he believed the car was likely stolen, he believed police were pursuing

---

[5] The current first degree motor vehicle theft statute differs from the 2020 version, *see* section 18-4-409(2), C.R.S. 2024, so we cite the 2020 statute, which applied at the time of the offense.

him before the crash, and his passenger fled the scene.[6] Thus, the jury could infer that Casados knowingly drove the car without authorization. *See People v. Donald*, 2020 CO 24, ¶ 37 (juries may infer knowledge from circumstantial evidence). The prosecutor's misstatement equating belief with knowledge did not undermine the fairness of Casados's trial. *See Licona-Ortega*, ¶ 88. The court also instructed the jury to only apply its instructions on legal rules, not the attorneys' comments on the rules, and the jury instructions properly defined the mental state, "knowingly." *See People v. Carter*, 2015 COA 24M-2, ¶¶ 59-61 (discerning no plain error in part because the jury received proper instructions).

¶ 50    Similarly, we conclude that the prosecutor's statements that Casados confessed and said he knew the car was stolen were harmless. Because these statements do not "specifically and directly offend a constitutional right," we review for harmless error. *Licona-Ortega*, ¶ 87. Under this standard, we reverse if there is "a reasonable possibility that the error might have contributed to the

---

[6] At trial, a witness testified that, after the crash, he saw a woman exit Casados's car, "check on the person in the driver's seat, and flee the scene."

conviction." *Zoll v. People*, 2018 CO 70, ¶ 18 (citation omitted). Casados argues that the statements were not harmless because (1) the evidence supporting motor vehicle theft was not overwhelming; (2) saying that Casados confessed improperly appealed to the jury's passion; and (3) the prosecutor repeated the comments.

¶ 51    First, as to evidence of guilt, Granmoe suggested that the person who allegedly held Casados at gunpoint entered the car *after* Casados. This suggests Casados had control of the stolen car before the alleged apprehension. And, as discussed above, the car was stolen, Casados believed it was stolen, he continued to drive it after "Little Nutty" exited and until the crash, and he believed police were pursuing him. The woman seen fleeing scene, the items in the car potentially belonging to a woman,[7] the amount of time between the theft and accident (one month), and the lack of damage to the steering wheel and ignition also do little to cast doubt on Casados's guilt; he drove a stolen car that he believed was stolen, regardless of who stole it, when it was stolen, or whether it was damaged.

---

[7] At trial, an officer testified that several items, which could have belonged to a woman, were found in the car.

¶ 52    For similar reasons, the prosecutor's mischaracterization of Casados's statements as a confession did not appeal to the jury's passion or prejudice such that there was "a reasonable possibility that the error might have contributed to the conviction." *Zoll*, ¶ 18 (citation omitted).  The evidence overwhelmingly supported Casados's guilt, and the statement did not encourage the jury to reach a verdict "on the basis of bias or prejudice" rather than the evidence.  *Harris v. People*, 888 P.2d 259, 266 (Colo. 1995).

¶ 53    Finally, that the prosecutor repeated the improper statements orally and through PowerPoint slides does not change our analysis. Defense counsel told the jury Casados did not confess, reminded the jury of Granmoe's testimony, and the prosecution revised its argument in rebuttal, noting that Casados said he believed the car was stolen (despite having improperly equated belief with knowledge).  And the court's improper rejection of defense counsel's objections did not, as Casados suggests, increase any prejudicial effect.  The court instructed the jury that it could not draw conclusions from objections or the court's rulings.  *See Carter*, ¶ 59 ("[W]e presume that the jury followed [the court's] instructions.").

¶ 54    Overall, we conclude that the court's error in allowing the prosecutor to misstate evidence and argue facts not in evidence was harmless because, given the evidence that was properly before the jury, there is not "a reasonable possibility that the error might have contributed to the conviction." *Zoll*, ¶ 18 (citation omitted).

¶ 55    We also reject Casados's argument that cumulative error warrants reversal. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24 (Cumulative error requires reversal if "multiple errors . . . collectively prejudice the substantial rights of the defendant, even if any single error does not."). The prosecutor's misstatements were brief, and the jury heard Granmoe's repeated testimony — the day before closing arguments — that Casados said he believed the car was stolen. There was also significant evidence supporting his guilt, the jury was instructed to reach a verdict solely based on the evidence, and it was properly instructed on the law.

## IV.    Disposition

¶ 56    The judgment of conviction is affirmed.

JUDGE HARRIS and JUDGE SCHUTZ concur.